UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEITH A. BRIGHT,                    )
                                    )
            Plaintiff,              )
                                    )
        v.                          )        No. 4:11 CV 1892 RWS / DDN
                                    )
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security     )
                                    )
            Defendant.              )

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Keith A. Bright for disability insurance
benefits under Title II of the Social Security Act (the Act), 42 U.S.C.
§ 401, et seq., and for supplemental security income under Title XVI of
the Act, 42 U.S.C. § 1381, et seq.  The action was referred to the
undersigned United States Magistrate Judge for review and a recommended
disposition under 28 U.S.C. § 636(b).  For the reasons set forth below,
the undersigned recommends that the decision of the Administrative Law
Judge (ALJ) be reversed and remanded for further proceedings.

## I.  BACKGROUND

Plaintiff Keith A. Bright, who was born in 1971, filed applications
for Title II and Title XVI benefits on July 29, 2009 and August 7, 2009,
respectively.  (Tr. 113-22.)  He alleged a disability onset date of July
24, 2009,[1] due to degenerative disc disease, a herniated disc, and
sciatica.[2]  (Tr. 62, 158-61, 163-64.)  His applications were denied

_____

[1]Plaintiff originally alleged disability beginning on August 1,
2008, but amended his alleged disability onset date to July 24, 2009.
(Tr. 14, 208.)

[2]Sciatica refers to pain in the lower back and hip radiating down
the back of the thigh into the leg, usually due to a herniated lumbar
disc compressing a nerve root, most commonly the L5 or S1 root.
Stedman's Medical Dictionary 1731 (28th ed. 2006).

initially on November 17, 2009, and he requested a hearing before an ALJ.[3] (Tr. 10, 53-55, 62-71.)

On December 6, 2010, following a hearing, the ALJ found that plaintiff was not disabled. (Tr. 19-28.) On September 14, 2011, the Appeals Council denied plaintiff's request for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On December 7, 2007, plaintiff was seen at the emergency department of Barnes Jewish Hospital for complaints of neck and lower back pain after he was involved in an automobile accident. X-rays of the lumbar spine revealed normal alignment, no fractures, preserved disc spaces, and unremarkable soft tissues. He was diagnosed with neck and lumbrosacral strains. Later that day, he was feeling better and was discharged. He was prescribed Tramadol, Naproxen, and Cyclobenzaprine.[4] (Tr. 281-82, 288-91, 297-98.)

On December 17, 2007, plaintiff was seen at the emergency department of Barnes Jewish Hospital for worsening neck pain. He also reported having a "little tingling" in his fingers but thought this may have been due to cold weather. X-rays of the cervical spine were negative. Rachel Ash-Bernal, M.D., prescribed Oxycodone and Diazepam,[5] and discharged him with instructions to do no heavy lifting until after his follow-up examination. (Tr. 268-75.)

---

[3]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 416.1406, (2007). These modifications include, among other things, the elimination of the reconsideration step. See 20 C.F.R. §§ 404.966, 416.1466.

[4]Tramadol is used to relieve moderate to moderately severe pain. Naproxen is a nonsteroidal anti-inflammatory drug used to relieve pain, swelling, and joint stiffness. Cyclobenzaprine is used short-term to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

[5]Oxycodone is used to relieve moderate to severe pain. Diazepam is used to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

- 2 -

On January 27, 2008, plaintiff was seen at the emergency department of Barnes Jewish Hospital for complaints of pain in his back, wrist, and right shoulder. X-rays showed normal alignments; no fractures in his hip, shoulder, and spine; a degree of mild degenerative disc disease in his lower cervical spine; and well-maintained lumbar spine disc spaces. A head CT scan was also negative. He moved all extremities well and lacked any extremity edema. He was discharged that day, told to follow-up with his primary physician, and told that he could return to work in four days. (Tr. 244-47, 253, 260-61.)

On January 29, 2008, plaintiff was seen by Ladonna Finch, M.D., for a check-up following the automobile accident. His straight leg raise test was 70 degrees, he had left lower back pain, he was able to flex his hip 100 degrees with his knee bent, and his strength was 5/5. Dr. Finch assessed musculoskeletal pain and prescribed Ibuprofen, Flexeril, and Ultram.[6] (Tr. 303.)

On March 4, 2009, plaintiff was seen at the Forest Park Community Hospital Emergency Department for complaints of lower back pain. He reported that his "lower back went out" two days earlier and that he was in a scooter accident a year earlier. No imaging was ordered and straight leg testing was negative. His symptoms improved, he was prescribed Vicodin[7] and Naproxen, and he was told to follow-up with his primary care physician in the morning. (Tr. 211-18.)

On July 24, 2009, plaintiff was seen at the emergency room of Barnes Jewish Hospital after he reportedly popped his back when lifting a moped the night before and then woke up with lower back pain, weakness, and leg numbness. X-rays revealed normal alignment, no fracture or listhesis,[8] mild narrowing of the L5-S1, and mild degenerative disc disease as L5-S1.

---

[6]Flexeril is used short-term to treat muscle spasms. Ultram is used to relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

[7]Vicodin is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

[8]Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum. Stedman's at 1813.

Straight leg raise testing was positive but upon inspection, his spine was normal. Plaintiff was also diagnosed with a herniated disc and was prescribed Oxycodone, Diazepam, and Ibuprofen. (Tr. 220-24, 229-31, 238, 241.)

On August 3, 2009, plaintiff reported having low back pain. Treatment notes state that he appeared in pain. Straight leg raise testing was positive bilaterally at 25 degrees with shooting pain in the legs. Dr. Finch referred plaintiff to neurology. (Tr. 304.)

On August 7, 2009, A. Fernandez conducted an in-person interview of plaintiff and completed a Disability Report - Field Office form. Fernandez noted that plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, walking, seeing, using his hands, writing, or with his coherency, but had difficulty sitting and standing. Fernandez also noted that plaintiff had to hold onto a desk to stand and had to stand for a few moments until he could walk away. (Tr. 146-49.)

On August 8, 2009, plaintiff was seen at Grace Hill Neighborhood Health Services upon complaints of low back pain. He had a normal musculature, no joint deformity or abnormality, and a normal range of motion. He was assessed with lumbago;[9] prescribed Ibuprofen, Tramadol, and Flexeril; and referred to an orthopedic physician. (Tr. 300-01.)

On August 27, 2009, plaintiff completed a Work History Report form. He listed his prior work as a warehouse stocker, restaurant worker, restaurant delivery driver, warehouse forklift operator, restaurant shift supervisor, auto auctions supervisor, restaurant doorman, restaurant pizza deliverer, warehouse forklift operator, and machine shop machine operator. He also described the walking, standing, sitting, climbing, stooping, kneeling, crouching, crawling, handling, reaching, writing, lifting, and carrying demands of each of these jobs. (Tr. 166-77.)

That day, plaintiff also completed a Function Report - Adult form. In the form, he reported living in an apartment with a roommate and listed his daily activities as getting up, taking pain medication, taking a hot bath, laying down on the couch, eating, and going to bed. Before

_____

[9]Lumbago is pain in the mid and lower back. Stedman's at 1121.

his conditions, he could sit up longer, stand, and drive. His conditions made him wake up in pain when rolling in his sleep, and impaired his ability to dress, bathe, care for his hair, shave, feed himself, use the toilet, or sit up for very long. He prepared his own simple meals daily. He did his laundry when on his pain medication but needed someone else to carry his clothes up and down the stairs. He did not do house or yard work because of constant, extreme back pain. He could drive alone but rarely did so because it hurt his back and could cause an accident. His only hobby was watching television, because he cannot do other things. His pain made him unable to lift, walk, climb stairs, understand, squat, sit, bend, kneel, stand, complete tasks, reach, concentrate, and use his memory. He could walk only 100 feet before needing a rest and could pay attention for only 1 minute. He used crutches, a cane, and a brace, although only the brace was prescribed by a doctor. He also reported that his back injury was worsening every week. (Tr. 178-85.)

That day, plaintiff also completed a Missouri Supplemental Questionnaire. He reported that he was not working; he had begun taking Tramadol, Lorazepam,[10] and Flexerel in the time since he applied for disability; he used a computer; and he drove very little. He stated that only by taking pain medications and laying on his back could he relieve his pain; that with his pain medications he could sit for only five or ten minutes; and that he had numbness and shooting pain down his legs depending on whether he was taking his pain medication. (Tr. 186-88.)

On August 28, 2009, plaintiff was seen at St. Louis Connect Care medical clinic. When he arrived, he was "in distress" and reported having leg pain, the severity of which was a ten on a ten-point scale. His lumbar spine was tender to palpation and he had an antalgic gait. He reported having pain in his lower back radiating down both legs since July 24, 2009, after he lifted a heavy scooter and heard his back pop the next morning. He was advised to go to the emergency department and to have an MRI of his lumbar spine. (Tr. 307-11.)

---

[10]Lorazepam is used primarily to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

On August 29, 2009, plaintiff was seen in the emergency department of Barnes Jewish Hospital upon complaints of lower back pain radiating down both legs, difficulty urinating, and intermittent urinary incontinence. He stated that his back pain began about a year earlier due to a "scooter accident" and that his medicine was no longer working. An MRI revealed a paracentral disc extrusion at L5-S1 with impingement of the lumbar S1 nerve root. He had a positive straight leg raise on the right and perineal numbness, but also had full strength in his lower extremities and full use of all four extremities. (Tr. 313, 319-21.) An MRI revealed straightening of the lumbar spine, normal vertebral bodies, disc desiccation[11] with loss of height at L5-S1, left paracentral disc protrusion at L5-S1 with severe narrowing of the lateral recess and neural foramina, impingement of the left S1 nerve root and abutment of the left S2 nerve root, an annual tear at L4-L5, severe left neural foraminal narrowing at L5-S1, and renal cysts on each side. (Tr. 336-37.)

On August 30, 2009, Paul Santiago, M.D., performed a left L5-S1 open microdiscectomy to treat plaintiff's left L5-S1 herniated nucleus pulposus, which was causing him left leg pain and difficulty urinating. (Tr. 331-33.)

On October 2, 2009, plaintiff followed-up at the Barnes Jewish Hospital Neurology and Neurosurgery clinic after his microdiscectomy. Chad Washington, M.D., noted that plaintiff was "doing well," had full low extremity strength, and had equal and symmetric reflexes. Dr. Washington told plaintiff to return in two months and to increase his activity as-tolerated. (Tr. 396-97, 400.)

On November 16, 2009, Michele Delgado, a single decision-maker for the Social Security Administration, completed a Physical Residual Functional Capacity Assessment form for the period of August 1, 2008 to August 1, 2009. Delgado stated that mild degenerative disc disorder was the primary diagnosis, and opined that plaintiff could occasionally lift

---

[11]Disc desiccation is abnormal dryness of the intervertebral discs and is the earliest visible sign of disc degeneration. Rugh v. Astrue, Civil Action No. 07-2208, 2008 WL 2156715, at *3 n.10 (E.D. Pa. May 21, 2008).

and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit for a total of 6 hours in an 8-hour workday; and had no push or pull limits. Delgado explained that these limitations were consistent with plaintiff's prescriptions of Ultram and Flexeril. Delgado noted no postural, manipulative, visual, communicative, or environmental limitations. Regarding the symptoms alleged, such as pain from bending, doing laundry, driving, lifting, standing, walking, or sitting, Delgado found plaintiff's complaints only partially credible, reasoning that the x-rays did not support the levels of pain and limitations alleged. (Tr. 56-61.)

On December 4, 2009, plaintiff was seen as an outpatient at the Barnes Jewish Hospital neurosurgery department. He reported that since his microdiscectomy his symptoms of radicular leg pain and weakness had "improved significantly." His most significant complaint was of lumbar back pain, which he described as worse at night and in the morning. Although his back pain improved throughout the day, it prevented him from lifting or walking. Matthew Reynolds, M.D., noted that plaintiff had an "excellent" recovery and 5/5 strength in his bilateral upper and lower extremities, and opined that plaintiff's low back pain was consistent with osteoarthritis. Dr. Reynolds encouraged plaintiff to attend outpatient physical and occupational therapy, increase in functional status, and return to work as-tolerated, but to consider getting another job which requires less physical labor. (Tr. 387, 391-94.)

From December 22, 2009 to October 14, 2010, plaintiff saw Robert Holloway, M.D., for his low back pain. Records from these visits note that plaintiff's pain was exacerbated by bending, coughing, getting up and down, lifting, laying down, sitting, standing, and general activity, and was alleviated by hot baths, laying down, rest, and medication. On December 22, 2009, he reported sharp, constant low back pain with no lower extremity radiation. Dr. Holloway noted that plaintiff had an antalgic gait, positive TTP of the SI joint bilaterally, positive mild FABER test results bilaterally,[12] and decreased range of motion of the

---

[12]A FABER test is used to determine the presence of sacroiliac disease, which is a disease caused by high-impact trauma to the (continued...)

lumbar spine to flexion and lateral rotation. Dr. Holloway prescribed Vicodin and Medrol, and instructed plaintiff to follow-up in one month. On January 22, 2010, plaintiff reported posterior neck discomfort and associated discomfort between his shoulder blades with superior radiation but no upper extremity radiation. Dr. Holloway prescribed Baclofen,[13] Vicodin, and Tramadol, and instructed plaintiff to follow-up with Dr. Padda for an injection. On February 1, 2010, Dr. Holloway prescribed Baclofen, Vicodin, and Tramadol. (Tr. 432-33, 444-47.)

From February 23, 2010 onward, plaintiff reported sharp, constant low back pain with no left extremity radiation but some buttock extension. That day, Dr. Holloway prescribed Tramadol, Vicodin, and Methadone.[14] (Tr. 430-31.) On April 27, 2010, Dr. Holloway discontinued Tramadol and prescribed Vicodin and Methadone. (Tr. 422-23.) On June 22, 2010, plaintiff reported doing "horrible" and receiving no benefit from his lumbar cortiosteroid injections. Dr. Holloway prescribed Docusate Sodium, Methadone, and Norco.[15] (Tr. 492-93.) On July 20, 2010, Dr. Holloway prescribed Zanaflex, Methadone, and Norco. (Tr. 490-91.) On August 17, 2010, Dr. Holloway prescribed Miralax, Zanaflex,[16] Norco, and Methadone, and scheduled an MRI. (Tr. 488-89.) On October 14, 2010, plaintiff reported that he benefitted from the Norco and Methadone and

---

[12](...continued)
sacroiliac joint, located at the bottom of the back. Physical Therapy, http://physicaltherapy.about.com/od/orthopedicsandpt/ss/LEspecialtests_2.html (last visited July 2, 2012).

[13]Baclofen is used to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

[14]Methadone is used to treat moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

[15]Docusate Sodium is used to treat constipation. Norco is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

[16]Miralax is used to treat constipation. Zanaflex is used to treat muscle tightness and cramping. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

had decreased spasms with the Zanaflex. Dr. Holloway prescribed Zanaflex, Norco, and Methadone. (Tr. 513-14.)

On January 20, 2010, plaintiff was seen at the Barnes Jewish Hospital emergency department for neck pain after he tried to hold a car trunk door open with his head. An x-ray revealed no fracture or listhesis in the cervical or thoracic spine and no loss of vertebral body height. He was diagnosed with a neck strain and was directed to take Naproxen for pain and inflammation, continue taking Flexeril, take Oxycodone or Acetaminophen as-needed for severe pain, follow-up with Dr. Holloway later that week, and return to the emergency department if his symptoms worsened. (Tr. 354, 357, 360, 365, 374.)

On January 27, 2010, plaintiff saw Gurpreet Padda, M.D., for a selective nerve root injection at L4-5 and L5-S1 for his lumbosacral spondylolysis without myelopathy, lumbar disc displacement, degenerative disc disease, lumbar spine stenosis, and post-lumbar laminectomy syndrome. There were no complications and he was told to return in two weeks. Dr. Padda noted "[n]early complete resolution of radicular symptoms within fifteen seconds of the procedure." On February 17, 2010, plaintiff saw Dr. Padda and received an intraarticular injection at L3-S1. There were no complications and he was told to follow-up within two to four weeks. Dr. Padda noted that plaintiff "reported immediate reduction in pre-procedure symptomology with normal ranges of motion" after the injection. (Tr. 412-14.)

On February 11, 2010, Dr. Padda completed nerve conduction velocity and f-wave testing, which revealed decreased conduction velocities and amplitudes of the bilateral peroneal motor nerves and normal response of the bilateral superficial peroneal sensory nerves suggesting a proximal lesion at the L4-5 root level. An EMG of selected bilateral lower extremity muscles demonstrated positive waves and decreased recruitment in a predominately L5 distribution consistent with a proximal lesion at the L5 root. (Tr. 419-21.)

On February 18, 2010, an MRI of plaintiff's cervical spine was unremarkable at C2-3, C3-4, and C7-T1, but at C4-5 revealed a moderate-sized right paracentral disc protrusion without compression that was

mildly effacing the cord; at C5-6 a mild broad disc osteophyte[17] complex; moderately narrowed right foramen from an osteophyte that may have impinged on the right C6 nerve root; and at C6-7 a moderate right paracentral disc protrusion with extension into the right lateral recess compressing the right C7 root, as well as moderate narrowing of both foramena. (Tr. 406.)

On February 27, 2010, plaintiff saw Dr. Padda for an injection at L3-S1. There were no complications and plaintiff "reported immediate reduction in pre-procedure symptomology with normal ranges of motion." (Tr. 410-11.)

On March 15, 2010, plaintiff saw Dr. Padda for a selective nerve root injection. There were no complications and plaintiff was directed to return in two weeks. Dr. Padda noted "[n]early complete resolution of radicular symptoms within fifteen seconds of the procedure." On March 29, 2010, plaintiff returned and received another injection. There were no complications. Dr. Padda made the same notation and told plaintiff to return again in two weeks. (Tr. 408-09.)

On June 11, 2010, plaintiff was seen at the Barnes Jewish Hospital emergency department upon complaints of increasing back pain. He reported his pain was a ten on a one-to-ten scale, his back felt pinched, and he had numbness and tingling down the left side of his body to his foot. He stated that he was having trouble sitting and standing and that his medication was not helping. He appeared anxious, talked quickly, and did not want to move much or sit-up. Sanford Sineff, M.D., noted that follow-up notes showed significant improvement, although plaintiff had stated that he had not improved. Dr. Sineff diagnosed low back pain, prescribed Hydromorphone and Ketorolac,[18] and discharged plaintiff to home. (Tr. 459, 461, 466, 469, 475-78.)

On June 22, 2010, Dr. Holloway completed a Physician's Assessment for Social Security Disability Claim form. In the form, Dr. Holloway

---

[17]An osteophyte is a bony outgrowth or proturberance. Stedman's at 1391.

[18]Hydromorphone is used to relieve moderate to severe pain. Ketorolac is used for the short-term treatment of mild to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 2, 2012).

stated that his prognosis was pending a neurosurgery referral. (Tr. 457.)

On August 19, 2009, Mitra Boodram, M.D., opined that an MRI revealed left laminotomy[19] at L5-S1 with moderate epidural fibrosis extending into the left lateral recess around the S1 root and anterior margin of the sac. Dr. Boodram suspected a tiny recurrent protrusion in the left anterior epidural space near the midline, and noted slight flattening of the left anterior sac, normal lumbar vertebral height and alignment except slight retrolisthesis at L5/S1, foraminal bulging disc at L4-5, straightening of the lumbar lordosis, and no spinal stenosis. (Tr. 496.)

On September 28, 2010, plaintiff saw Faisal Albanna, M.D., for an initial evaluation of low back pain. Dr. Albanna noted that plaintiff's past treatment included epidural steroid injections, chiropractic treatment, physical therapy, medications, and surgery, and that, although these modalities provided some relief, more recently plaintiff reported no relief. An examination revealed evidence of stiffness and tenderness, decreased cervical range of motion, decreased lumbar range of motion flexion with pain, decreased extension with pain, abnormal posture, severe guarding of the LS-spine, and mild guarding of the cervical spine. Plaintiff was unable to walk on his heels and toes because of his low back pain. Straight leg raise testing was negative on the right side, positive on the left side 30 degrees, and positive with pain radiating to the left buttocks, posterior thigh, posterior calf, and foot. Plaintiff had normal muscle tone and full muscle strength in all groups. Dr. Albanna diagnosed lumbar degenerative disc disease, recurrent lumbar herniated disc, lumbar radiculopathy, retrolisthesis, sciatica, cervical spondylosis, and cervicalgia.[20] Dr. Albanna opined plaintiff would be unable to return to his original physically demanding job, would

---

[19]Laminotomy is the removal of a portion of a vertebral lamina resulting in enlargement of the intervertebral foramen for the purpose of relieving pressure on a spinal nerve root. Stedman's at 1006.

[20]Cervicalgia is "pain in the posterior or lateral regions of the neck." Genwright v. Astrue, No. 3:10-CV-913-J-TEM, 2012 WL 527580, at *6 (M.D. Fla. Feb. 17, 2012) (citing On-line Medical Dictionary, http://www.online-medicla-dictionary.org).

- 11 -

eventually need surgery, and would benefit from lumbar fusion and stabilization to address his mechanical and neurological issues. Dr. Albanna also opined that x-rays of five lumbar non-rib bearing vertebrae revealed degenerative changes, mild and moderate; degenerative disc disease at L5-S1; laminotomy at L5-S1 left; post-operative changes; and retrolisthesis at L5-S1. (Tr. 500-02, 508.)

In an undated Work History Report, plaintiff listed his work history as a restaurant worker and warehouse stocker. As a restaurant worker, he delivered food, managed the restaurant, waited on tables, cleaned, and made food. This job required him to walk, stand, and reach for 4 hours; handle, grab, or grasp big objects and/or write, type or handle small objects for 3 hours; and/or climb, stoop, kneel, crouch, and/or crawl for 2 hours. He supervised 15 people in this position. (Tr. 150-52.)

In an undated Disability Report - Adult - Form, plaintiff stated the following: He was unable to work due to degenerative disc disease, a herniated disc, and his sciatica. These conditions made him unable to stand, sit, or lift, and caused him constant pain. These conditions first interfered with his ability to work on August 1, 2008, and he became unable to work beginning that day. He stopped working part-time on July 24, 2009, after going to the emergency room. He previously worked as a restaurant worker and warehouse stocker. As to the restaurant worker position, he had to lift and carry 60-pound buckets of food each week, as well as dishes, cases of soda, and cans of pizza sauce--objects weighing 50 pounds or more. He completed two years of college, and was then-taking Diazepam, Ibuprofen, and Oxycodone. (Tr. 158-61, 163-64.)

In an undated Disability Report - Appeal - Form, plaintiff reported that since September 2, 2009, the pressure on his spine had eased up, but that he had begun suffering from arthritis. He further reported that on December 4, 2009, his surgeon told him that he had chronic arthritis, and that he was now taking Cyclobenzaprine, Ibuprofen, Lorazepam, and Tramadol. (Tr. 192-96.)

**Records Submitted Directly to the Appeals Council**

In his January 31, 2011 request for review to the Appeals Council, plaintiff submitted an amended medication list in which he reported that he was taking Methadone, Docusate, Baclofen, and Cyclobenzaprine, Ibuprofen, Hydrocodone, and Caster Oil. (Tr. 8-14, 207.)

**Plaintiff's Testimony at the Hearing**

On July 14, 2010, a hearing was conducted before the ALJ. (Tr. 29-52.) At the hearing, plaintiff testified to the following:

Plaintiff was 39 years old at the time of the hearing. He completed the ninth or tenth grade, got his GED, and completed a few semesters of community college through a vocational rehabilitation program before stopping due to financial difficulties. (Tr. 31-32.) He previously worked for OSL, Inc., where he loaded and unloaded trucks and operated a fork lift; at Harrisonburg Auto Auctions, where he drove a tow truck and changed car tires; as a shift supervisor for Steak and Shake; in the shipping and receiving department of Shrowder and Tremain; in the warehouse shipping and receiving department at Casco; delivering pizzas; and most recently, delivering groceries part-time for Shapiro's Market. (Tr. 32-37.) He had to stop working at Shapiro's because of pain in his back from a disc herniation. (Tr. 37-38.) He did not file for unemployment benefits after leaving Shapiro's. (Tr. 38.)

His back pain dates back to when his children jumped on his back while they were playing. Later, he was injured in a moped accident, which made his back even worse. He continued driving the moped after the accident, and re-injured himself lifting the moped. (Id.)

He had micro disc surgery roughly one year before the hearing, during which the doctor removed as much of the disc as possible, leaving his back without cushion. He saw the doctor after the surgery and told him that he was no longer having shooting leg pain, but that the pain had moved to his hip. He was on strong pain medication then, which reduced his foot pain, but not his hip or back pain. His pain returned and worsened as soon as he tried to resume normal activities. He has had to increase his pain medication because either his pain has worsened or his body has become accustomed to the medication. He tried to see his

surgeon, Dr. Santiago, when he started to have leg pain after the
surgery, but Dr. Santiago only referred him to his pain management
doctor.   (Tr. 38-41.)

He also has problems with his neck.  Specifically, his neck locks
up in pain.  An MRI revealed that he has two bulging discs and boney
spurs growing on one of the discs.  Sometimes he cannot turn his neck for
the entire day, and laying down to relieve his back pain causes him
greater neck pain.   On January 20, 2010, he twisted his neck while
resting his car's trunk hatch on his neck so that he could get groceries
out of his trunk.  (Tr. 41-42.)  His neck pain is located under his
skull, in the side of his head, and goes down between his shoulder blades
to the base of his neck.  (Tr. 47.)

His pain is not excruciating right after he takes the largest dose
of his pain medications and lays in bed for a few hours.  During this
time he can get out of bed and do things around the house.  No doctor has
referred him to a psychiatrist or a psychologist, although he has
considered going to one.  (Tr. 43.)

During questioning by his counsel, plaintiff testified that he has
not received any sustained relief from the nerve root injections or facet
joint injections by Dr. Halloway and Dr. Padda.  He was referred to see
a neurosurgeon, Dr. Albana, whom he was scheduled to see on August 3,
2010.  His back pain is worse when he bends or lifts, especially when he
is in a twisted position.  Because of his pain, he cannot sit or stand
for very long.  His pain medication makes him dizzy, vomit, constipated,
and unable to concentrate or remember things, but he cannot get out of
bed unless he takes it and even then he is only slightly functional.  He
has also lost weight because of his pain medication. (Tr. 43-45.)

Aside from taking his pain medication, he lays on his back, puts his
feet together, and spreads his legs to relieve some of the pressure from
his hips.  He never sits; he only lays down.  He can walk for only 100
feet or stand for 10 minutes before he has to stop and rest.  He can sit
for only five or six minutes before he has to lay down.  In a typical
day, he wakes up at 8:00 a.m., but does not get out of bed until 10 or
11 o'clock.  After getting up, he eats, feeds his cats, goes to the
bathroom, lays on the couch, watches television or reads, and does any

"obligations" he has planned.  In an average eight-hour period after he wakes up, he typically spends seven hours laying down.  He could not make it through an entire day without laying down.  (Tr. 45-46.)  His girlfriend does the household chores, such as grocery shopping; however he feeds the cats and sometimes goes on short grocery shopping trips himself. (Tr. 48.)

The ALJ observed that throughout the hearing, plaintiff stood up at least three times because of hip and low back pain.  (Tr. 48.)

**Vocational Expert's Testimony at the Hearing**

A vocational expert (VE), Malcolm Brodcinsky, also appeared and testified at the hearing.  The ALJ first asked the VE to assume a hypothetical individual of plaintiff's age, with 13 years of education and the same past work experience as plaintiff, who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 hours in an 8-hour day; sit for 6 hours in an 8-hour day; occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; occasionally stoop, kneel, crouch, or crawl; not repeatedly use foot controls when pushing or pulling; and avoid concentrated exposure to the hazards of unprotected heights and vibration.  The VE testified that this hypothetical individual could return to plaintiff's past work as a shift supervisor as that job is performed nationally and described in the Dictionary of Occupational Titles (DOT), although not as the job is performed as described by plaintiff's testimony or the record.  (Tr. 48-49.)

In the second hypothetical question, the ALJ asked the VE to assume the same characteristics and limitations as the first hypothetical person had, except that the individual could lift only 10 pounds occasionally and less than 10 pounds frequently; stand or walk for 2 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday.  The VE testified that these limitations would preclude all of plaintiff's past work, but this individual could perform the full range of unskilled, sedentary work.  The VE further testified that with this ability, the individual could work as a telephone quotation clerk or as a final assembler of optical goods, although only the assembler job would accommodate a

sit/stand option.  The VE noted that there were other unskilled, sedentary jobs that would permit a sit/stand option, as well.  The VE stated that his testimony was consistent with the DOT and Selected Characteristics of Occupations.  (Tr. 49-51.)

Plaintiff's counsel then asked the VE to assume an individual who, because of ongoing pain, would require unscheduled rest breaks throughout the day in excess of the typical two fifteen-minute breaks and one thirty minute-break given for lunch.  The VE testified that this individual would be unable to perform unskilled, sedentary or light work.  (Tr. 51.)

### III. DECISION OF THE ALJ

On December 6, 2010, the ALJ issued a decision unfavorable to plaintiff.  (Tr. 16-28.)  At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 1, 2008, the alleged onset date.  (Tr. 21.)  At Step Two, the ALJ found that plaintiff suffered from the severe impairments of residual effects of lumbar microdisc surgery, degenerative disc disease, and degenerative joint disease of the spine, but that any side effects plaintiff suffered from his medications had less than a minimal effect on his ability to perform work-related functions and were thus non-severe.  At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments that meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ also specifically noted that plaintiff did not meet Listing § 1.04 for a spinal disorder.  (Tr. 22.)

The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to lift and carry ten pounds frequently and less than ten pounds occasionally; stand or walk two hours out of an eight-hour workday; sit six hours out of an eight-hour workday; never climb ropes, ladders, or scaffolds; and occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl.  The ALJ added that plaintiff should never perform work requiring more than repetitious use of foot controls, and that plaintiff must avoid concentrated exposure to the hazards of unprotected heights and vibration.  (Tr. 22-26.)

At Step Four, the ALJ found that plaintiff was unable to perform any of his past relevant work (PRW).  (Tr. 26.)  At Step Five, the ALJ

determined that based on the VE's testimony and plaintiff's age, education, work experience, and RFC, plaintiff retained the RFC to perform jobs existing in significant numbers in the national economy. Accordingly, the ALJ found plaintiff not disabled under the Act. (Tr. 27-28.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis

proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his PRW.  Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Id.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

## V.  DISCUSSION

Plaintiff argues the ALJ erred in (1) concluding that he did not suffer from a listed impairment at Step Three, (2) evaluating his RFC, and (3) evaluating his credibility.

## A.  Step Three: Listing § 1.04

Plaintiff argues that the ALJ's Step Three decision is not supported by substantial evidence.  Plaintiff argues that his impairments satisfy the elements of Listing § 1.04A, specifically, that he suffers from nerve root compression causing an inability to effectively walk.

At Step Three, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. Bowen v. Yuckert, 482 U.S. 137, 141 (1987).  If the claimant has an impairment that meets or medically equals such a listing, the claimant is conclusively presumed to be disabled.  Id.  The claimant bears the burden of establishing each of the elements of a listed impairment.  Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010).

Listing § 1.04A is the listing for disorders of the spine.  20 C.F.R. Part 404, Subpart P, Appendix 1.  To meet Listing § 1.04A and give rise to a conclusive presumption of disability, a claimant must establish that he suffers from a spinal disorder (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in the compromise of a nerve root or the spinal cord, accompanied with evidence of nerve root compression characterized by (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

- 18 -

reflex loss; and (4) if there is involvement of the lower back, positive
straight-leg raising test (sitting and supine).  Id.  In addition, the
claimant's abnormalities must be established over time to satisfy the
elements of a listing.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D
("Because abnormal physical findings may be intermittent, their presence
over a period of time must be established by a record of ongoing
management and evaluation.").

In his opinion, the ALJ briefly discussed why he held that none of
plaintiff's impairments, either singly or in combination, met or medically
equaled a listed impairment:

> [Plaintiff] does not meet Listing 1.04 for a spinal disorder
> because he lacks evidence of nerve root compression, spinal
> arachnoiditis, or pseudo-claudication of his lumbar spine that
> results in an inability to ambulate effectively.

(Tr. 22.)

The ALJ's determination that plaintiff failed to establish each of
the elements of Listing § 1.04A, namely, nerve root compression, is not
supported by substantial evidence.  Although records from February 11,
2010, which "suggest[ed]" the possibility of compression, would likely not
be sufficient alone to establish nerve root compression,[21] see Decker v.
Astrue, No. 11-3115-CV-S-DGK-SSA, 2011 WL 6000257, at *2 (W.D. Mo. Nov.
30, 2011) (" '[P]robable' or 'possible' findings, however, are not
sufficient to establish compromise of the nerve root or spinal cord as
required by Listing § 1.04."), the ALJ failed to address the other, more
definite records of nerve root compression.  Specifically, the ALJ's
explanation at Step Three did not account for and is contradicted by the
August 29, 2009 MRI showing impingement of the left S1 nerve root, or the
February 18, 2010 MRI that showed mild cord effacement at C4-5 and right
C7 root compression.  (Tr. 336-37, 406.)

---

[21]Nor would plaintiff's subjective reports by themselves be
sufficient to establish the nerve root compression sufficient to satisfy
Listing § 1.04A.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D
(explaining that "physical findings must be determined on the basis of
objective observation during [an] examination and not simply a report of
the [claimant]'s allegation").

While the ALJ may have had reason to discount some or all of these records,[22] the ALJ's explanation as to why plaintiff failed to satisfy Listing § 1.04A--lack of evidence of nerve root compression--is not supported by the current record. The same is true regarding the record evidence of plaintiff's difficulty in walking effectively, as the record contains evidence of plaintiff having difficulty walking that the ALJ failed to recognize expressly. (Tr. 391-95, 488-89, 500-02.) Although "[t]he fact that the ALJ does not elaborate on [his or her Step Three] conclusion does not require reversal where the record supports [his or her] overall conclusion," Jones, 619 F.3d at 969, the record here does not support, and instead conflicts with, the ALJ's Step Three conclusion.

Thus, the action should be remanded to the ALJ for reconsideration and additional discussion of the medical record relevant to the elements of Listing § 1.04A. On remand, the ALJ can recontact any doctors or obtain medical expert testimony in order to discern accurately whether plaintiff's severe impairments, either singularly or in combination, meet or medically equal Listing § 1.04A. E.g., Good Face v. Astrue, No. CIV. 07-4162-KES, 2008 WL 4861548, at *18 (D.S.D. Nov. 7, 2008) (remanding for a reevaluation where "additional development of the record with respect to [the claimant]'s cardiac condition may have changed the ALJ's finding at step three" (citing Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984)).

**B.  RFC and Credibility**

Plaintiff also argues that remand is necessary because the ALJ did not cite to specific medical evidence supporting his RFC determination and because the ALJ improperly evaluated his credibility, namely, by not accounting for Dr. Holloway's regular finding that plaintiff's subjective complaints were highly concordant with the objective medical findings.

Because remand is necessary for further evaluation and development of the record concerning whether plaintiff suffers from nerve root

---

[22]For example, defendant notes that plaintiff underwent an L5-S1 microdiscectomy on August 30, 2009, after which his symptoms of radicular leg pain and weakness were reported as significantly improved. (Tr. 391.)

compression resulting in an inability to walk effectively for purposes of Listing § 1.04A, on remand the ALJ should expressly note the medical evidence he relied on for his RFC determination and should expressly discuss Dr. Holloway's findings regarding the concordance between plaintiff's subjective complaints and the objective medical evidence.[23] The ALJ should also provide Dr. Holloway with an additional opportunity to "state [his] prognosis as to whether [plaintiff's] condition would reasonably prevent him from working at least twelve continuous months," which Dr. Holloway declined to answer because of a then-"pending neurosurgery referral." (Tr. 457.) Because remand is necessary for further evaluation and discussion at Step Three and because the ALJ's RFC determination or credibility analysis could be changed or more thoroughly discussed on remand, the undersigned recommends that the court not address these issues at this time.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


        /S/    David D. Noce
        **UNITED STATES MAGISTRATE JUDGE**


Signed on July 12, 2012.

---

[23]In his opinion, the ALJ made no mention of Dr. Holloway's findings in this regard.